E. L. SCOTT ROOFING CO., INC. v. STATE OF NORTH CAROLINA AND PENN-
SYLVANIA NATIONAL MUTUAL CASUALTY INSURANCE COMPANY

No. 8610SC156

(Filed 5 August 1986)

**State § 2.2— repairs to roof—damage to interior of building—roofer not contrac-
tually liable**

The trial court erred in concluding as a matter of law that plaintiff was
contractually liable to the State for damage to the interior of a building sus-
tained during a rainfall after some unknown third person walked on and
damaged a temporary roof installed by plaintiff at the State's direction, since
neither plaintiff nor its men nor subcontractors caused the damage to the tem-
porary roof; plaintiff met the obligation of its contract that it "provide cover
and protect all portions of the structure when the work is not in progress" by
installing the temporary roof and ventilation hatch cover before leaving the
job site; plaintiff could not be held liable for interior damages under the con-
tract provision that "[a]ny work damaged through the lack of proper protection
or from any other cause shall be repaired or replaced without extra cost to the
owner," since only the temporary roof, which plaintiff promptly repaired, and
not the repairs to the underlying structure constituted work within the mean-
ing of the contract; plaintiff's failure to conform with the contractual re-
quirements to place barriers to protect people on the work site could not be
used to hold it liable for damage to the structure; reliance on the "usual
custom and practice in the industry" would not result in liability in this case;
and the building in question was not damaged "during the course of the work"
by plaintiff so as to impose liability on plaintiff.

APPEAL by plaintiff from *Read, Judge*. Judgment entered 13
September 1985 in Superior Court, WAKE County. Heard in the
Court of Appeals 11 June 1986.

Plaintiff, E. L. Scott Roofing Co., Inc. (Scott), brought this ac-
tion pursuant to G.S. 143-135.3 to recover sums allegedly due it
under a contract for repairs to the roofs of several buildings,
including Dudley Hall, on the campus of North Carolina A & T
State University. The stipulated facts show that during the
course of the work on Dudley Hall, Scott discovered that the met-
al decking which supported the roof had deteriorated to the ex-
tent that a new roof could not be installed according to the
State's plans and specifications. This discovery necessitated a
delay in the project in order that additional design work could be
accomplished by the State's architect and additional funding could
be obtained. Scott was instructed to install a temporary roof
pending approval of a change order for the additional work. Scott

installed the temporary roof and left the job site. Thereafter, rainwater leaked through the temporary roof, causing damage to the interior and contents of Dudley Hall totalling $41,859.84. Inspection of the temporary roof revealed that it had been damaged by either some unknown cause or by someone walking on it. The parties stipulated that no employee or representative of Scott had walked on the temporary roof. Scott repaired the temporary roof.

After the change order for replacement of the metal decking was approved, Scott returned to the site and completed the repairs to the roof of Dudley Hall. The State withheld the sum of $41,859.84 from final payment to Scott, contending that Scott is liable, under the terms of its contract, for the damages caused by the leak in the temporary roof.

Scott was insured against contractual liability for property damage by the terms of a general liability insurance policy issued by defendant Pennsylvania National Mutual Casualty Insurance Company (Pennsylvania National). The parties stipulated that Pennsylvania National is obligated to reimburse Scott for any amount which the State properly withheld from Scott for damages to Dudley Hall.

As provided by G.S. 143-135.3, the case was heard by the trial judge, without a jury. The court found, *inter alia*, the following facts:

3. During August, 1982, plaintiff discovered that metal decking supporting the existing roof was rusted beyond the point where it would be safe to install a new roof without replacement of the metal decking. This finding necessitated a delay to allow the State of North Carolina time to design a new roof support system and obtain funds for the additional work needed.

4. Plaintiff installed a temporary roof on the portion of Dudley Hall where the existing roof had been removed. The temporary roof was fragile in nature and could be damaged by persons walking on it. Such damage could reasonably be expected to allow intrusion of water into the building. Plaintiff's subcontractor, Seeger Waterproofing, continued to perform work in waterproofing the parapet wall on Dudley Hall.

Plaintiff informed representatives of Seeger of the existence of the temporary roof and that "extraordinary care" was needed to be taken to protect it. Plaintiff also informed Mr. Eugene Midyette, the architect who was then acting as the representative of the State of North Carolina in regard to that contract, that the temporary roof was in place. Plaintiff then left the project.

5. Plaintiff and Seeger's only method of access to the roof was through a ventilation hatch opened by plaintiff for that purpose. By means of a ladder from the interior of the building's third floor, workmen could climb directly through the ventilation hatch onto the roof. Upon leaving the project, plaintiff placed a cover over the hatch to prevent water from getting through it. The cover was not secured in place and was easily removable by workmen.

6. No ropes with banners, barricades or signs were placed anywhere to give warning of the fragile nature of the temporary roof or to prevent persons from walking on it. Placement of such warning devices where fragile or hazardous conditions exist is the usual and customary practice in the construction industry.

7. Simultaneously with plaintiff's work and known to plaintiff, another independent contractor was performing exterior work consisting of replacing, repairing and painting exterior trim on campus buildings including Dudley Hall. In order to reach the upper levels of buildings of that height, they employed a swinging stage which is a scaffold suspended by ropes or cables from hooks over the roof parapet wall and utilizes a safety device referred to as a "dead man's tie." The customary practice in the construction industry is to go upon the roof in order to attach the swinging stage. This method was used on Dudley Hall by the other independent contractor. Plaintiff's subcontractor observed workmen on the roof of Dudley Hall attaching the swinging stage but did not warn the workmen of the fragile nature of the temporary roof or the resulting damage that would ensue from walking on it.

8. On or about September 26, 1982, a rainfall occurred. The temporary roof had been damaged and heel marks were observed on it. Rainwater leaked through the damaged por-

tion and caused damage to the interior of the building and contents thereof resulting in monetary damage to defendant in the sum of $41,859.84.

9. In reliance upon contractual provisions regarding plaintiff's responsibilities for protection of the work, property and the public, defendant withheld that sum of money from plaintiff at the completion of the project.

The trial court concluded that Scott had a duty imposed by the contract to protect the building and its contents from damage while the work was in progress and while it was not in progress; that Scott's failure to prevent access to the roof and to warn and prevent others from walking on the roof was a breach of its contractual duty; and that the damage to the building and its contents was a reasonably foreseeable result of that breach. Thus the court concluded that the State had properly withheld from Scott an amount equal to the damage to the building and denied Scott any recovery on its contract with the State. Pursuant to the insurance policy and the parties' stipulation, judgment was entered awarding Scott a recovery of $41,859.84 as against Pennsylvania National. Both Scott and Pennsylvania National appeal.

*Attorney General Lacy H. Thornburg, by Special Deputy Attorney General T. Buie Costen, for the State.*

*White, Allen, Hooten, Hodges & Hines, by John M. Martin, for plaintiff appellant.*

*Henson, Henson & Bayliss, by Perry C. Henson, Jr. and J. Victor Bowman, for Pennsylvania National Casualty Insurance Company, defendant appellant.*

MARTIN, Judge.

Scott and Pennsylvania National, having filed a joint brief in this Court, take the same position on appeal. They contend the trial court erred in concluding as a matter of law that Scott was contractually liable to the State for damages to the interior of Dudley Hall. We agree.

The State neither alleges nor contends that Scott was negligent in any respect in its performance of the work; rather the State claims that it had the right to withhold the $41,859.84 from

its payment to Scott because Scott breached certain provisions of the contract. The State contends the following contractual provisions support the trial court's findings and conclusions that Scott and its insurer Pennsylvania National are liable for the damages:

ARTICLE 12.

The Contractors shall be jointly responsible for the entire site and the building or construction of the same and provide all the necessary protections, as required by the Owner or Engineer or Architect, and by laws or ordinances governing such conditions. They shall be responsible for any damage to the Owner's property, or of that of others on the job, by them, their men, or their sub-contractors, and shall make good such damages. They shall be responsible for and pay for any claims against the Owner. All prime contractors shall have access to the project at all times.

The Contractor shall provide cover and protect all portions of the structure when the work is not in progress; provide and set all temporary roofs, covers for doorways, sash and windows, and all other materials necessary to protect all the work on the building, whether set by him, or any of the sub-contractors. Any work damaged through the lack of proper protection or from any other cause, shall be repaired or replaced without extra cost to the Owner.

. . . .

The Contractor shall provide for all necessary safety measures for the protection of all persons on the work, including the requirements of the A.G.C. Accident Manual in Construction as amended, and shall fully comply with all State laws or regulations and Building Code requirements to prevent accident or injury to persons on or about the location of the work. He shall clearly mark or post signs warning of hazards existing, and shall barricade excavations, elevator shafts, stair wells and similar hazards; he shall protect against damage or injury resulting from falling materials; he shall maintain all protective devices and signs throughout the progress of the work.

ARTICLE 36

. . . .

*Care of Buildings and Grounds*: All Contractors are responsible for protection of the buildings and grounds on which they are working and shall pay for any repair, replacement or repainting any parts or elements of the buildings or grounds damaged or destroyed during the course of the work.

A contract is to be construed according to the intention of the parties as ascertained from the words used in the contract as well as the subject matter, desired results, and purposes thereof, and the situation of the parties at the time the contract is made. *State Highway Commission v. L. A. Reynolds Co.*, 272 N.C. 618, 159 S.E. 2d 198 (1968). Applying this rule of construction to the contract entered into by Scott and the State, we hold that Scott is not liable.

The first paragraph of Article 12 provided that Scott "shall be responsible for any damage to the Owner's property, or that of others on the job, by them, their men, or their sub-contractors, and shall make good such damages." The record reveals no evidence, nor did the trial court find that Scott, its men, or its sub-contractors, cause the damages to the temporary roof that allowed the rainfall to leak into and damage the building. The damage to the roof was caused by some unknown third person. Thus, Scott cannot be held liable for the damage under this portion of the contract.

Paragraph two of Article 12 provided that Scott "shall provide cover and protect all portions of the structure when the work is not in progress . . . ." Scott met this obligation when it installed the temporary roof and ventilation hatch cover before leaving the job site. The fact that the hatch cover was not secured in place is of no consequence in view of the trial court's finding that other contractors required access to the roof in order to complete their work.

The same paragraph also provided that "[a]ny work damaged through the lack of proper protection or from any other cause shall be repaired or replaced without extra cost to the Owner." In determining whether the court properly concluded that the appel-

lants were liable under this provision we must determine the meaning of the term "work" as it is used in this contract. When a contract defines a term, that definition is to be used. *Woods v. Insurance Co.*, 295 N.C. 500, 246 S.E. 2d 773 (1978). Work is defined in this contract as follows: " 'work,' as used herein as a noun, is intended to include materials, labor and workmanship of the appropriate contractor." The damages for which the State withheld the $41,859.84 were for neither materials, labor nor workmanship of Scott; the damages were for repairs to the underlying structure of Dudley Hall occasioned by water leakage and caused by the actions of some unknown third party who damaged the temporary roof which Scott had placed on the building. Under the terms of the contract only the temporary roof, which Scott promptly repaired, constituted "work" within the meaning of the contract. Thus, the State's claim cannot be sustained by reliance upon this clause of the contract.

Scott's liability was also predicated upon its failure to place banners, barricades or signs to warn of the fragile nature of the roof and to prevent people from walking upon it. The court found, and Scott does not contest the fact, that there were no banners, barricades or signs placed around the roof. The court concluded that Scott's failure to place barricades was a breach of the contract which supported the State's action in withholding the funds. The contract required Scott "to provide all necessary safety means for the protection of all *persons* on the work." (Emphasis added.) Included as a part of the requirement for the protection of persons on the work was the marking or posting of signs warning of the hazards which existed. However, the trial court did not find that the temporary roof constituted a hazard, requiring warnings to prevent injury to persons. The trial court's reliance upon this provision to support Scott's liability for the damages to Dudley Hall is misplaced. The unambiguous language of the contract shows that the provisions relating to signs and barriers were intended for the protection of persons on the job site and not for the protection of the property upon which the work was being performed. Scott's failure to conform with the contractual requirements to place the barriers to protect people on the work site cannot be used to hold it liable for damage to the structure.

Nor does the court's finding with respect to the "usual custom and practice in the industry" result in liability in this case.

A custom or usage may be proved in explanation and qualifi-
cation of the terms of a contract which otherwise would be
ambiguous, . . . but evidence of a usage or custom is never
admitted to make a new contract or to add a new element to
one previously made.

*Lester Brothers, Inc. v. J. M. Thompson Co.*, 261 N.C. 210, 218,
134 S.E. 2d 372, 378 (1964) (quoting 55 Am. Jur., Usages and Cus-
toms § 31).

Finally, we must determine whether the provision set forth
in Article 36 of the Contract regarding care of buildings and
grounds supports the court's judgment. The issue which must be
determined with respect to Article 36 is whether Dudley Hall was
damaged "during the course of the work" by Scott.

The term "during the course of the work" is not defined in
the contract, thus, the presumption is that these words are to be
given their ordinary significance. *Lester Brothers, Inc. v. J. M.
Thompson Co., supra.* Webster's New World Dictionary (2d Col-
lege Edition 1974) defines "in the course of" as being "in the prog-
ress or process of; during." Applying this definition to the term
"during the course of work" we hold that this term was meant to
encompass only that time while Scott was actually engaged in
working on the Dudley Hall project. Once Scott, at the State's di-
rection, placed a temporary roof on the building, discontinued its
work, and left the premises to await further authorization from
the State, the work was no longer in progress until that authori-
zation was given. Thus, Scott could not be held liable under that
portion of Article 36 relied upon by the court to impose liability.
To interpret the clause otherwise would make Scott a virtual in-
surer of the building against the acts of third persons even when
it had no control over these persons or over the premises. We do
not believe that the parties intended or contemplated such a duty
when they entered into the contract.

None of the provisions of the contract make the appellants li-
able for the water damage to Dudley Hall. The judgment of the
trial court is reversed and the case remanded for entry of judg-
ment consistent with this opinion.

Reversed and remanded.

Judges WHICHARD and PHILLIPS concur.